OPINION
The instant appeal stems from a final judgment of the Jefferson County Court of Common Pleas. Appellant, Raymond A. Twyford, III, seeks reversal of the trial court's decision granting summary judgment in favor of the state regarding all the claims asserted in appellant's petition for postconviction relief. For the reasons which follow, we affirm the trial court's decision in all respects.
In March 1993, appellant was tried and convicted of aggravated murder, aggravated robbery, kidnapping, and having a firearm while under a disability. Appellant was then sentenced to death for the aggravated murder. This conviction was predicated upon an incident in which appellant and a second offender lured the victim to an obscure field in Jefferson County and shot him multiple times with a rifle and pistol.
The state's case against appellant was primarily based upon a confession appellant gave to the police shortly after the discovery of the victim's body. In the confession, appellant indicated that, as of September 1992, he was living with his girlfriend and her two minor daughters at the girlfriend's residence in Portage County, Ohio. During this time, appellant had befriended Daniel Eikelberry, who lived in an apartment a short distance from the girlfriend's home. Eikelberry resided with Richard Franks, a mildly retarded individual who was an acquaintance of appellant's girlfriend and her two daughters.
According to appellant, on the evening of September 19, 1992, Eikelberry told him that Franks had allegedly raped the youngest daughter of appellant's girlfriend. After discussing the situation fully, they formulated a plan to kill Franks and dispose of his body. Two days later, appellant and Eikelberry invited Franks to go deer hunting that night. When Franks agreed, the three men drove over one hundred miles to a secluded field by State Route 646 in Jefferson County. Upon arriving at that location, appellant and Eikelberry convinced Franks to walk into the woods and attempt to "spot light" a deer through the use of a flashlight. As Franks was walking into the woods a second time, appellant shot him in the back with a 30.06 caliber rifle. He and Eikelberry then each shot Franks one time in the head.
As part of his confession, appellant further admitted that, after Franks had died, he and Eikelberry agreed to mutilate the body so that it could not be recognized. Besides cutting the hands off the body, they fired a number of additional shots into the victim's head. They then rolled the corpse into a nearby pond and disposed of the hands in a separate location.
Two days following the murder, Franks' body was discovered by a couple walking through the secluded field near the pond. Although appellant and Eikelberry had tried to remove all forms of identification from the body, they overlooked a small calendar book which Franks had kept in the pocket of his inner shirt. In searching the corpse following its discovery, the Jefferson County Sheriff found the book and, accordingly, was able to identify the body. In turn, the sheriff also discovered that Franks had lived in Portage County.
As Eikelberry had been Franks' roommate, he was the first individual interviewed during the subsequent investigation. As part of his statement to the police, Eikelberry implicated appellant in the murder. As a result, appellant was placed under arrest and taken to a local police department in Portage County for questioning. After being held for approximately one hour, appellant gave an oral and written confession concerning the murder to the Jefferson County Sheriff.
Upon being transported back to Jefferson County, appellant was indicted on, inter alia, two counts of aggravated murder under R.C. 2903.01(B). Each of these counts contained a death penalty specification alleging that appellant had committed the murder in conjunction with the commission of a separate underlying felony, and that he either had been the principal offender in the commission of the murder or had committed the murder with prior design and calculation.
As was noted previously, the state's evidence during the guilt phase of the ensuing trial essentially consisted of appellant's confession. In responding to the state's case, appellant did not present any witnesses or evidence in his own behalf. Despite this, appellant's counsel did try to establish a possible motive for the murder. Specifically, during the cross-examination of the Jefferson County Sheriff, counsel elicited testimony that appellant had told the sheriff that he had committed the murder because Franks had raped his girlfriend's youngest daughter. To rebut this, the state presented testimony designed to demonstrate that appellant himself had been engaging in sexual activity with both of his girlfriend's daughters.
After deliberating for less than one day, the jury found appellant guilty of all of the charged counts, including the death-penalty specifications. During the ensuing penalty phase, appellant presented evidence designed to bolster his justification for the murder. In testifying in his own behalf, appellant stated that, in addition to being physically abused by his stepfather as a child, he had been sexually assaulted while he had been incarcerated on minor theft offenses. Appellant further testified that, in light of his own experiences, it was his belief that rapists were never properly punished. Based on this, appellant stated that he felt that Franks would never be punished for raping the child unless he killed Franks.
Appellant also presented the testimony of a psychologist, Dr. Donald Gordon. This expert stated that, as a result of appellant's own difficult childhood, he had a tendency to become attached emotionally to children quickly and to act as their protector against abusive individuals.
Although the state did not present any new evidence during the penalty phase, the jury still returned a recommendation that the death penalty be imposed. In its ensuing sentencing judgment, the trial court independently concluded that the death penalty was warranted because the aggravating circumstances outweighed the mitigating factors in the case.
In his direct appeal from the foregoing conviction, appellant initially asserted only three assignments of error for this court's consideration. In October 1995, we issued an opinion overruling the three assignments and affirming the imposition of the death penalty. However, approximately fifteen months later, we granted appellant's motion to reopen the appeal on the basis that he may have been denied effective assistance of appellate counsel. As a result, appellant was permitted to file a new appellate brief in which he raised twenty-five assignments of error. Nevertheless, after considering the merits of these new assignments, this court concluded that appellant had not been denied effective appellate assistance and again affirmed the imposition of the death penalty. SeeState v. Twyford (Sept. 25, 1998), Jefferson App. No. 93-J-13, unreported.
Prior to the issuance of our opinion upon reopening, appellant filed with the trial court a petition for postconviction relief under R.C.2953.21. In this petition, appellant essentially asserted eight claims for relief, the majority of which stated that appellant's conviction should be vacated because he had been denied effective assistance of counsel during his trial. Specifically, under the majority of his claims, appellant argued that his trial counsel had failed to present certain evidence which would have proven additional mitigating factors against the imposition of the death penalty.
In support of his eight claims, appellant attached to his petition multiple affidavits of certain individuals who stated what the substance of their testimony would have been if they had been called to testify. The affiants included Daniel Eikelberry, a different psychologist who had examined appellant, a medical doctor who was an expert on the effect of alcohol intoxication on the human brain, a mitigation specialist, and various members of appellant's family.
In conjunction with the postconviction petition, appellant submitted a motion for discovery for both the Jefferson County Prosecutor's Office and the Jefferson County Sheriff's Department. In additional to a general request for exculpatory items, appellant stated in his motion that he was especially seeking any information regarding an alleged prior rape which had involved the same daughter who had supposedly been raped by Richard Franks. Upon considering the discovery motion, the trial court denied it on the basis that appellant had not established good cause.
After appellant's petition had been pending for approximately four months, the state moved for summary judgment as to each of the eight claims. In support of its motion, the state did not present any evidential materials which were designed to contradict the materials submitted by appellant; instead, the state essentially maintained that appellant's materials were insufficient, as a matter of law, to show that his constitutional rights had been violated.
Once appellant had submitted a response to the summary judgment motion, the trial court rendered its decision in favor of the state as to each of appellant's eight claims for relief. In its judgment entry, the trial court primarily held that appellant had not been denied his right to effective assistance of trial counsel because the introduction of the "new" evidence cited by appellant in his postconviction petition would not have altered the outcome of the trial.
In now appealing the foregoing decision, appellant has assigned the following as error:
 "[I.] Ohio's postconviction system does not comply with the requirements of due process as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.
 "[II.] The trial court erred when it denied appellant's requests for discovery in violation of appellant's rights under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution and Article I, Sections 1, 2, 9, 10, 16 and 20 of the Ohio Constitution.
 "[III.] The trial court erred in granting summary judgment against appellant Twyford and dismissing his postconviction action in violation of appellant's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution."
Under his first assignment, appellant contends that the Ohio statutory scheme for postconviction relief, R.C. 2953.21 et seq., does not give a criminal defendant a proper procedural mechanism for contesting alleged violations of constitutional rights because the Supreme Court of Ohio has placed too many restrictions on the use of the remedy. Citing to State v.Perry (1967), 10 Ohio St.2d 175, appellant argues that the application of the doctrine of res judicata to postconviction petitions improperly limits the types of claims which can be asserted in such a proceeding. In support of this point, appellant emphasizes that the inadequacy of the remedy can be inferred from the fact that petitions for postconviction relief are actually granted on only rare occasions.
Although not expressly stated in appellant's brief, he has essentially requested this court to overrule the Perry holding. In considering arguments similar to this, appellate courts of this state have simply concluded that such an argument can be properly raised only before the Supreme Court itself. In State v. Wiles (1998), 126 Ohio App.3d 71, the defendant maintained that the procedure set forth in the postconviction statutes did not provide an adequate remedy because the statutes had been interpreted to have too many technical requirements. In making this argument, the defendant was asking the appellate court to ignore the holding of Freeman v. Maxwell (1965), 4 Ohio St.2d 4, in which the Supreme Court had held that the postconviction procedure constituted an adequate legal remedy which precluded the use of a habeas corpus action as a means of raising constitutional issues. Without addressing the actual merits of the defendant's argument, the Wiles court stated that an appellate court did not have the power to refuse to follow a Supreme Court decision.
The Wiles holding is clearly applicable to appellant's instant argument. As to this point, we would emphasize that the Supreme Court recently reaffirmed Perry in State v. Szefcyk (1996), 77 Ohio St.3d 93. Thus, we are bound to follow the Perry holding concerning the application of the res judicata doctrine to postconviction proceedings.
As an aside, we would further note that the Wiles defendant also asserted that the fact that it was extremely difficult to obtain postconviction relief demonstrated that the remedy was inadequate. Although it was not necessary to address this point, the Wiles court indicated that its review of the relevant case law did not support the conclusion that postconviction statutes failed to provide a true remedy: "These cases demonstrate that a petitioner's chance of success depends more on the merits of his claim than on the procedural obstacles he faces." Wiles at 84. Again, the foregoing analysis applies to appellant's argument as to the effect of the application of the resjudicata doctrine on postconviction proceedings.
As a court of error, we cannot simply ignore the stare decisis
character of an Ohio Supreme Court holding. Appellant's legal contentions under this assignment are more properly directed to that forum. Appellant does not raise an argument which this court can sustain, although it may be sympathetic with respect to some aspects of appellant's submissions. Thus, appellant's first assignment is without merit.
Under his second assignment, appellant challenges the trial court's decision to deny his motion for discovery. Appellant asserts that he was entitled to conduct discovery because a postconviction proceeding under R.C. 2953.21 is considered civil in nature. He further asserts that, since a party in a civil action is entitled to complete discovery before summary judgment can be granted, he was not given a legitimate opportunity to develop his claims before judgment was entered against him.
Like appellant's first assignment, the resolution of his second assignment is also dictated by express precedent of the Supreme Court of Ohio. In State ex rel. Love v. Cuyahoga Cty. Prosecutor's Office (1999),87 Ohio St.3d 158, 159, the court stated that "there is no requirement of civil discovery in postconviction proceedings."
In support of the foregoing statement, the Love court cited with favor the decision of the Third Appellate District in State v. Spirko (1998),127 Ohio App.3d 421. In the latter case, the Spirko court began its analysis by noting that postconviction proceedings in Ohio are governed solely by statutory law. The court then noted that R.C. 2953.21 et seq., did not contain any provision allowing for discovery. Based on this, theSpirko court concluded that the trial court had not erred in refusing the defendant's request for discovery.
Although not cited in either Love or Spirko, this court would note that the holding in both cases is consistent with the Supreme Court's interpretation of Crim.R. 16(B) and R.C. 149.43, the public records statute. In State ex rel. Steckman v. Jackson (1994), 70 Ohio St.3d 420, the court indicated that, prior to his trial in a criminal proceeding, a defendant cannot employ R.C. 149.43 to obtain documents from the prosecutor which would not be subject to discovery under Crim.R. 16(B). The Steckman court also stated that once a defendant has exhausted his direct appeal from his conviction, he cannot use R.C. 149.43 to obtain documents from the prosecutor to support a postconviction relief petition. Id. at paragraph six of the syllabus. Furthermore, as to post-trial requests for documents from the prosecutor, the Supreme Court has held that such a request cannot be made under Crim.R. 16 because the duty to disclose exculpatory evidence under that rule only applies before or during trial. State ex rel. Flagner v. Arko (1998), 83 Ohio St.3d 176,177.
In light of the foregoing precedent, it is evident that the Ohio Supreme Court has determined that discovery between the state and a defendant can take place only when a criminal case is pending for trial. This basic holding is based on the proposition that a defendant's post-judgment motion cannot be predicated upon additional information from the prosecutor which had not been disclosed prior to the end of the trial. Steckman at 432. Thus, by concluding that discovery cannot be had as part of a postconviction proceeding, the Love court was acting consistent with its general precedent on the issue of criminal discovery.[1]
Prior to the issuance of the Love decision, there existed some authority for the basic proposition that the allowance of discovery in a postconviction proceeding was a matter within the sound discretion of the trial court. See Wiles, supra, at 77, citing State v. Smith (1986),30 Ohio App.3d 138, 140. However, that authority has no further value as precedent. That is, pursuant to Love and Spirko, there are no circumstances under which a defendant in postconviction proceedings can be entitled to discovery.
Although the trial court in the instant case improperly based its decision to deny the discovery motion on a finding of no good cause, the foregoing analysis supports the trial court's disposition of the matter. Accordingly, as the trial court did not err in denying appellant's motion, his second assignment in this appeal lacks merit.
Appellant's third assignment of error constitutes the crux of this appeal, since he specifically attacks the trial court's analysis in granting summary judgment in favor of the state. Appellant contends that summary judgment should have been denied because he submitted sufficient evidential materials to create a factual dispute regarding whether certain violations of his constitutional rights had occurred during his trial. In turn, he further maintains that his evidential materials were sufficient to require the trial court to hold an oral hearing on his postconviction petition.
R.C. 2953.21(D) states that either party in a postconviction proceeding can move for summary judgment on the petition. This statute further provides that a trial court should grant such a motion only when the right to such a determination is apparent on the face of the record. In applying the foregoing basic provisions, the Supreme Court of Ohio has indicated that a trial court's consideration of a summary judgment motion in a postconviction proceeding is generally governed by Civ.R. 56. Statev. Milanovich (1975), 42 Ohio St.2d 46, 51.
In interpreting Civ.R. 56, the courts of this state have consistently held that, before summary judgment can be granted, the moving party must establish that: (1) there is no genuine dispute as to any material fact; (2) the state of the evidential materials is such that, even if the materials are construed in a manner most favorable to the nonmoving party, reasonable minds could only reach a decision favorable to the moving party; and (3) the moving party is entitled to judgment as a matter of law. See, e.g., Heitanen v. Rentschler (Dec. 17, 1999), Geauga App. No. 98-G-2187, unreported, at 13, 1999 Ohio App. LEXIS 6112. To satisfy the foregoing standard, the moving party has the initial burden of stating to the trial court the legal basis for the motion and identifying the portions of the record which show that there are no genuine factual disputes. Westfield Ins. Co. v. Paglio (Aug. 4, 2000), Lake App. No. 99-L-022, unreported, at 10, 2000 Ohio App. LEXIS 3529, quoting Dresher v. Burt (1996), 75 Ohio St.3d 280, 296. If the moving party does not fulfill this initial burden, his motion cannot be granted regardless of the content of nonmoving party's response to the motion; however, if the initial burden is carried, the nonmoving party must submit evidential materials indicating that a factual conflict does exist. State v. Pierce (1998), 127 Ohio App.3d 578, 587.
In regard to the factual portion of the moving party's initial burden, it has also been held that the moving party cannot merely state in the motion that the nonmoving party has no evidence to support his claim. Instead, the moving party must specifically refer to evidential materials which, in addition to complying with the forms listed in Civ.R. 56(C), affirmatively show that there is no evidence under which the opposing party can prevail. Heitanen, supra, unreported. Under Civ.R. 56(C), the acceptable forms of evidential materials include the pleadings, depositions, written admissions, transcripts of evidence, affidavits, answers to interrogatories, and written stipulations of fact.
In the instant appeal, our review of the state's motion for summary judgment shows that it satisfied its initial burden under the foregoing precedent. That is, not only did the state inform the trial court of the legal basis for its motion, but it also referred the trial court to specific evidential materials to support its legal argument. In relation to the latter prong of the initial burden, the state did not present any materials of its own, but merely referred to the materials appellant had attached to his petition. In essence, the state argued that appellant's own materials, in and of themselves, were not legally sufficient to raise a factual dispute regarding whether his constitutional rights had been violated at trial.
In responding to the state's summary judgment motion, appellant also referred only to the evidential materials he had attached to his petition. Thus, unlike the "normal" summary judgment exercise, this case did not involve a situation in which the trial court had to decide whether competing evidential materials created a factual dispute. Rather, the trial court had to decide whether, in light of the trial record, appellant's materials were sufficient to raise the possibility that a constitutional violation had occurred.
The materials accompanying appellant's petition primarily consisted of affidavits in which certain individuals gave statements concerning possible additional testimony they could have given at appellant's trial. Regarding this form of evidential materials, the Supreme Court of Ohio has recently stated:
 "* * * [I]n reviewing a petition for postconviction relief filed pursuant to R.C. 2953.21, a trial court should give due deference to affidavits sworn to under oath and filed in support of the petition, but may, in the sound exercise of discretion, judge their credibility in determining whether to accept the affidavits as true statements of fact. To hold otherwise would require a hearing for every postconviction relief petition. * * *
 "Unlike the summary judgment procedure in civil cases, in postconviction relief proceedings, the trial court has presumably been presented with evidence sufficient to support the original entry of conviction, or with recitation of facts attendant to an entry of a guilty or no-contest plea. The trial court may, under appropriate circumstances in postconviction relief proceedings, deem affidavit testimony to lack credibility without first observing or examining the affiant. That conclusion is supported by common sense, the interests of eliminating delay and unnecessary expense, and furthering the expeditious administration of justice. * * *
 "An affidavit, being by definition a statement that the affiant has sworn to be truthful, and made under penalty of perjury, should not lightly be deemed false. However, not all affidavits accompanying a postconviction relief petition demonstrate entitlement to an evidentiary hearing, even assuming the truthfulness of their contents. Thus, where a petitioner relies upon affidavit testimony as the basis of entitlement to postconviction relief, and the information in the affidavit, even if true, does not rise to the level of demonstrating a constitutional violation, then the actual truth or falsity of the affidavit is inconsequential." (Citations omitted.) State v. Calhoun (1999), 86 Ohio St.3d 279, 284.
Upon reviewing the various affidavits submitted by appellant in this case, this court concludes that the trial court did not err in granting summary judgment in favor of the state because, in light of the Calhoun
standard, the averments in those affidavits did not rise to the level of demonstrating a constitutional violation. Specifically, we hold that, as a matter of law, those affidavits were insufficient to show that appellant was denied his right to effective assistance of trial counsel because, even if the proposed testimony set forth in the affidavits had been presented at trial, it would not have altered the trial's outcome.
As was noted above, appellant asserted eight separate claims in his petition. Under his first claim, appellant argued that his trial counsel had rendered ineffective assistance by failing to call Daniel Eikelberry, the co-offender in the commission of the murder, to testify at trial. In four affidavits attached to the postconviction petition, Eikelberry averred that, if he had been called, he could have testified as to the following: (1) his belief concerning the facts underlying Franks' alleged rape of the youngest daughter of appellant's girlfriend; (2) his belief concerning whether appellant had been engaging in sexual activity with both daughters of appellant's girlfriend; (3) his belief concerning the facts of an incident in which Franks had allegedly slapped the oldest daughter; and (4) his belief as to whether appellant had suffered from painful headaches immediately prior to the murder.
In regard to the first aspect of Eikelberry's proposed testimony, this court would note that his statements concerning the nature of alleged rape would have corroborated the justification appellant gave for the murder. During both phases of appellant's trial, his trial counsel elicited testimony which was designed to establish that appellant had murdered Franks because Eikelberry had told appellant that he had seen Franks with the youngest daughter. Eikelberry's proposed testimony on this particular point would have supported appellant's contention that the rape had actually occurred and that he had been attempting to avenge or protect the daughter in murdering Franks.
Specifically, Eikelberry stated in his first affidavit that he could have testified as to the following regarding the point: (1) on September 20, 1992, both of the daughters of appellant's girlfriend were allowed to sleep at the residence of Eikelberry and Franks; (2) Eikelberry was away from the residence the majority of the evening; (3) when he returned to the residence at approximately 2:30 p.m., Eikelberry was walking toward his bedroom when he saw Franks lying on the floor inside the bedroom; (4) when he saw Eikelberry, Franks immediately stood up, readjusted his pants, and walked quickly from the bedroom; (5) as they passed each other near the doorway to the room, Franks asked Eikelberry not to tell anyone what he had just seen; and (6) when Eikelberry went into his bedroom, he saw the youngest daughter lying naked on the floor.
Clearly, the foregoing statements would have supported appellant's assertion that the rape had actually occurred. Nevertheless, this court holds that his testimony would not have been admissible in evidence during the guilt phase of the trial. Although the trial transcript shows that the trial court allowed appellant to elicit testimony about the alleged justification for the murder during the guilt phase, that evidence was not relevant to any material fact in dispute at that juncture of the trial. Not only was the testimony irrelevant to any element of the charged offenses, but it also lacked any relevance to any possible defense to the charges. For example, the justification testimony was not relevant to the factual issue of whether appellant had acted purposefully in causing the death of Franks.
The trial transcript further indicates that, despite its irrelevancy, the testimony as to the reason for the murder was admitted during the guilt phase because the state never objected to the testimony in question. However, although the state allowed this issue to be raised during the guilt phase, we cannot assume that the state would not have made an objection to Eikelberry's proposed testimony on this point. Like the testimony which was actually elicited on this issue, any testimony from Eikelberry concerning the reason for the murder was inadmissible because it was not relevant to any element or possible defense. Thus, the failure of trial counsel to call Eikelberry as a witness during the guilt phase cannot form the basis of a violation of the right to effective assistance.
As this court stated in our opinion upon reopening, appellant's contention that he had committed the murder to revenge the alleged rape was, at best, a moral justification for the crime. Accordingly, Eikelberry's proposed testimony concerning the fact that he had told appellant about the alleged rape would have been admissible in the penalty phase of the trial. Eikelberry's testimony would have helped to rebut the state's position that the murder had taken place because appellant did not want Franks interfering with his own sexual relationship with the child.
However, upon reviewing the transcript of the penalty phase, this court concludes that the introduction of Eikelberry's proposed testimony on this point would not have altered the outcome of the trial. In conducting our independent review of the imposition of the death penalty, we stated in our opinion upon reopening that the alleged rape of the child did not constitute sufficient provocation to justify the premeditated murder of Franks. In reaching this conclusion, we clearly assumed, for the sake of the analysis, that appellant had proven that the rape had occurred. Furthermore, our conclusion was supported by the fact that Franks' alleged commission of the rape did not necessarily mean that appellant had committed the murder to protect the child; instead, it was still feasible that the murder had occurred because appellant viewed Franks as a rival.
As a result, Eikelberry's proposed testimony would have been merely cumulative in nature. Therefore, it is pure speculation that the proposed testimony on this issue would have resulted in a jury verdict which would have recommended a life sentence.
The foregoing analysis also applies to the second and third aspects of Eikelberry's proposed testimony. Although testimony as to whether appellant was engaging in sexual relations with his girlfriend's daughters may have been admissible in the penalty phase, its introduction clearly would not have had any effect upon the jury's death penalty recommendation. Again, our analysis in the opinion upon reopening was predicated upon the assumption that, even if appellant's version of the various events were true, that factual scenario did not constitute a legal or moral justification for the murder. Accordingly, Eikelberry's proposed testimony would have merely reinforced a factual point which this court had already deemed proven for the sake of our analysis.
Similarly, testimony as to whether Franks had slapped the oldest daughter would not have altered the decision to impose the death penalty. Even if it were assumed that both the rape and the slapping did occur, no reasonable jury would have found that sufficient provocation had existed to justify the premeditated murder of the victim.
As to the fourth aspect of Eikelberry's proposed testimony, this court would note that, as part of a separate claim in his postconviction petition, appellant asserted that his trial counsel should have called a different psychologist to testify in his behalf during the penalty phase of the trial. Appellant also asserted that this new psychologist would have stated that appellant suffered from neuropsychological deficits which caused him to be unable to make rational and voluntary choices. According to appellant, the new psychologist would have further stated that the deficits were due to a head injury which appellant had suffered as a teenager.
In one of the affidavits attached to the postconviction petition, Eikelberry averred that, if he had been called as a witness, he would have stated that appellant had suffered from serious headaches during the time period prior to the murder. To the extent that this testimony would have bolstered the new psychologist's contention that appellant was still suffering from the effects of the head injury, Eikelberry's proposed testimony might have been relevant if the new psychologist had testified.
However, our review of the testimony of the psychologist who did
testify during the penalty phase indicates that this expert witness did not rely upon the head injury as an explanation for appellant's behavior; instead, the expert attributed appellant's actions to the difficulties appellant had experienced as a child. As will be discussed below, we conclude that appellant's trial counsel did not render ineffective assistance by relying solely upon the theory of this psychologist. Thus, because Eikelberry's testimony as to the headaches would not have been relevant to the "theory of the case" which trial counsel actually submitted to the jury, the failure to present that testimony would not have affected the outcome of the case.
To establish a claim of ineffective assistance, a criminal defendant must show that the performance of his trial counsel did not satisfy an objective standard of reasonable representation and that the inadequate performance was prejudicial to him. See State v. Williams (Oct. 16, 1998), Trumbull App. No. 97-T-0153, unreported, 1998 Ohio App. LEXIS 4884. In light of the foregoing discussion, this court concludes that, at the very least, appellant's evidential materials were insufficient to show that he was prejudiced by the failure of his trial counsel to call Daniel Eikelberry as a witness. Hence, the first claim in his postconviction petition did not establish that he had been denied effective trial assistance.
Under the second claim in his petition, appellant maintained that he was denied his right to effective assistance because his trial counsel failed to call a neuropharmacologist to testify in his behalf at trial. Appellant contended that such a witness would have been beneficial to his case because a neuropharmacologist could have explained the effect of alcohol on his thought processes at the time of the murder.
In support of this claim, appellant attached to his petition the report of Charles T. Kandiko, who had a doctorate in pharmacology and physiology. In this report, Kandiko averred that: (1) it was his opinion that, at the time of the murder, appellant had been under the influence of alcohol; (2) the alcohol in appellant's body had adversely affected his basic ability to consider the ramifications of his actions and, therefore, alleviated the fears he normally would have felt in that situation; (3) the alcohol also contributed to the feelings of rage appellant had against Franks; and (4) if appellant had not consumed the alcohol, he would not have committed the murder.
As a general proposition, alcohol intoxication can be invoked as a defense to a charge of aggravated murder when the level of intoxication is sufficient to negate the element of purpose. However, the defense will not apply when the evidence indicates that the intake of alcohol only resulted in reduced inhibitions or impaired judgment on the part of the defendant. That is, the defense can be invoked only when the level of intoxication is so severe that the defendant no longer had the mental ability to form the requisite mens rea. See State v. Combs (1994),100 Ohio App.3d 90, 101.
In his report concerning appellant, Dr. Kandiko never stated that appellant's level of intoxication was so high at the time of the murder that it deprived him of the ability to form the intent to kill. Moreover, our review of the trial transcript shows that there was no factual predicate from which such a finding could have been made. As to this point, we would emphasize that appellant's own confession indicated that his actions in committing the murder were done pursuant to a premeditated plan and that he was able to remember the events of that night quite vividly.
In fact, Kandiko only stated in his report that appellant's alcohol consumption had alleviated his fear of the various consequences of the murder. Pursuant to Combs, this fact would not have been sufficient to establish the defense of intoxication. Therefore, Kandiko's proposed testimony would not have been admissible during the guilt phase of appellant's trial.
In regard to the penalty phase, the Supreme Court of Ohio has held that voluntary intoxication can be a mitigating factor which can be considered in determining whether the death penalty should be imposed. Nevertheless, in State v. D'Ambrosio (1995), 73 Ohio St.3d 141, the Supreme Court emphasized that this factor should not be given much weight when the defendant has not been diagnosed as suffering from alcoholism.
In his report, Dr. Kandiko never gave any indication that appellant had become an alcoholic as a result of his use of alcohol. Furthermore, the report did not indicate that appellant's use of alcohol had caused any other type of mental disease or defect. Thus, pursuant to D'Amrosio, we conclude that, even though Kandiko's proposed testimony would have been admissible during the penalty phase of appellant's trial, the failure of his trial counsel to introduce similar testimony did not affect the outcome of the action because any testimony concerning appellant's level of intoxication would not have been entitled to any significant weight in the weighing exercise.
Because the Kandiko report was legally insufficient to raise a factual dispute as to whether appellant was prejudiced as a result of the failure of his trial counsel to call a neuropharmacologist as a witness, the second claim of his postconviction petition did not demonstrate that his constitutional rights had been violated.
Under his next claim, appellant contended that his conviction should be declared void because the psychologist who testified in his behalf at trial did not conduct a proper evaluation of him. Based upon this, appellant further contended that he was denied his constitutional right to effective assistance because his trial counsel predicated his defense during the guilt phase upon the opinion of that psychologist.
In support of his claim, appellant submitted the affidavit of a different psychologist, Dr. Newton Jackson, who had examined appellant immediately prior to the filing of the postconviction petition. In his affidavit, Jackson stated that the psychologist who had testified at trial, Dr. Donald Gordon, had relied too much upon the interviews he had conducted with appellant and members of his family. Jackson also opined that Gordon should have instead relied upon: (1) certain medical reports which had been produced when appellant was a teenager; and (2) the results of psychological tests. According to Jackson, these reports would have established that appellant had shot himself in the head during a suicide attempt and that a fragment of the bullet was still lodged in his head. In addition, the test results would have led Gordon to the conclusion that appellant did not have the ability to make voluntary and rational choices.
In relation to the adequacy of Dr. Gordon's evaluation of appellant, our review of the trial transcript demonstrates that Gordon's failure to consider the medical reports and tests results, as suggested by Dr. Jackson, was not malpractice. Rather, this omission was simply due to the specific nature of his training as a psychologist. At the outset of his testimony, Gordon stated that he was a behavioral psychologist who predicated his professional opinions upon his observance of a patient's actual behavior. Gordon further testified that, by the nature of his psychological philosophy, he tends to place less weight upon the results of psychological tests.
The trial transcript further indicates that Dr. Gordon gave a coherent and logical explanation for appellant's behavior in committing the murder. Moreover, this court would note that Gordon's explanation was consistent with appellant's own justification for his actions. That is, Gordon stated that, in his opinion, appellant's commission of the murder was his way of protecting the alleged rape victim from the same type of abusive behavior appellant had experienced when he was young. Thus, the record before us simply does not support the conclusion that Dr. Gordon failed to provide adequate expert testimony in support of appellant's trial strategy.
At best, Dr. Jackson's explanation of appellant's actions in committing the murder merely constituted an alternative psychological theory. Although Dr. Jackson's theory arguably constitutes a viable explanation for appellant's actions, the same can also be said for Dr. Gordon's theory.
In considering circumstances similar to this, the courts of this state have held that a finding of ineffective assistance cannot be based upon the trial counsel's choice of one competing psychological explanation over another. See, e.g., Combs, at 98. To hold otherwise would potentially place a burden on trial counsel to have his client tested and examined by a proponent of every available psychological and psychiatric school of thought. That is not a realistic proposition. Thus, appellant's third claim in his postconviction petition did not state a viable argument that the employment of Dr. Gordon as his expert witness at trial violated his constitutional rights.
Under the fourth claim for relief, appellant asserted that his trial counsel rendered ineffective assistance by failing to obtain the help of a mitigation specialist in preparing his defense. Appellant maintained that the use of such a specialist would have aided his counsel in obtaining additional information concerning his background which could have been presented to the jury during the penalty phase.
In attempting to demonstrate how a mitigation specialist could have helped in his defense, appellant attached to his petition certain documents which were designed to set forth what additional evidence could have presented at trial. These documents consisted of the affidavits of certain members of appellant's family who stated what the substance of their testimony could have been had they been called. The family members included appellant's mother, his brother, his grandmother, and two aunts.
A perusal of these affidavits readily indicates that the family members would have given testimony which primarily concerned the nature of appellant's childhood and his relationship with his stepfather. A comparison of this proposed testimony to the actual testimony presented during the penalty phase shows that the substance of the majority of the proposed testimony was submitted to the jury for their consideration. Both Dr. Gordon and appellant himself gave extensive testimony concerning the same topics that the family members addressed. In addition, Gordon testified that he had interviewed three of the family members in question.
Thus, the proposed testimony of the family members would have been cumulative in nature. Given these circumstances, this court concludes that the introduction of the proposed testimony would not have altered the outcome of the penalty phase in this case because the jury still would have found that the aggravating circumstance outweighed the mitigating factors. In turn, it follows that the failure of trial counsel to employ a mitigation specialist did not result in a violation of appellant's constitutional rights.
Under his fifth claim in his petition, appellant argued that his death sentence should be declared void because electrocution violates his constitutional right against cruel and unusual punishment. Appellant asserted that electrocution constitutes an unnecessary and wanton infliction of pain.
As to this claim, this court holds that this argument was not properly before the trial court in the context of a postconviction proceeding. As was noted previously, a criminal defendant is barred under the doctrine of res judicata from raising a defense or constitutional claim in a postconviction petition which could have been asserted at trial or on direct appeal. Williams, supra, unreported. The foregoing basic rule has been expressly applied to challenges to the constitutionality of the death penalty. See State v. Powell (1993), 90 Ohio App.3d 260, 267.
In support of his constitutional challenge to electrocution, appellant attached to his petition considerable evidential materials which had not been a part of the trial record in this case. However, these materials, along with appellant's legal argument on this issue, could have been readily raised before the trial court during his trial. As a result, appellant was barred from asserting this argument in his postconviction petition.
A similar analysis is applicable to the sixth claim in the instant appeal. Under that claim, appellant maintained that Ohio's procedure for reviewing the imposition of the death penalty is constitutionally flawed because the appellate courts and the Supreme Court of this state have failed to engage in an adequate proportionality review. In ruling upon arguments similar to the foregoing, the courts of this state have held that this type of argument cannot be asserted in a postconviction petition because a trial court does not have the authority to review the actions of superior courts. See, e.g., Powell, at 267. Hence, since appellant's sixth claim was not based upon a viable argument for postconviction relief, it was not properly before the trial court in the context of this case.
Under his seventh claim, appellant asserted that he was denied his constitutional right to effective assistance because his trial counsel failed to conduct the proper voir dire examination. In support of this particular claim, appellant attached to his petition the affidavit of Clive Stafford, an attorney from the state of Louisiana who has tried a significant number of death penalty cases. In this affidavit, Stafford averred that, after reviewing the transcript of appellant's trial, it was his belief that trial counsel had failed to question the potential jurors properly on a number of critical issues. Stafford further averred that, in his opinion, the failure to conduct an adequate voir dire denied appellant his right to a fair trial.
As to this claim, this court would merely note that, although Stafford's statements were set forth in the form of an affidavit, those statements essentially asserted a legal argument which could have been raised as an assignment of error in his appellate brief on direct appeal from his conviction. Therefore, appellant's seventh claim was barred under the doctrine of res judicata.
Under his final claim, appellant argued that he was entitled to have his conviction vacated as a result of the cumulative effect of the errors cited in his other seven claims. In light of our disposition of those other claims, this court concludes that relief was also not warranted under this particular claim. Although appellant's trial counsel could have introduced additional testimony during the penalty phase of the trial, the failure to do so, even when considered as a whole, did not have an adverse affect upon the outcome of the trial.
Pursuant to the foregoing discussion, this court ultimately concludes that, as to each of the eight claims in appellant's postconviction petition, there were no factual disputes as to any material fact. Furthermore, we hold that appellant's evidential materials were legally insufficient to establish that a violation of appellant's basic constitutional rights occurred during his trial. Therefore, as the trial court did not err in granting summary judgment in favor of the state in relation to appellant's entire postconviction petition, his third assignment of error lacks merit.
 ____________ FORD, P.J.
CHRISTLEY, J, Eleventh District Court of Appeals, sitting by assignment, NADER, J., Eleventh District Court of Appeals sitting by assignment, concur.
[1] Of course, this does not mean that a defendant is foreclosed from obtaining documents to support a postconviction petition from other public officials. However, the proper procedure for obtaining documents from officials other than the prosecutor would not be through discovery. Instead, the defendant would be required to bring a mandamus action under R.C. 149.43.